

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-14-2001

# Johnston v. HBO Film Mgt Inc

Precedential or Non-Precedential:

Docket 00-8070

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Johnston v. HBO Film Mgt Inc" (2001). *2001 Decisions.* Paper 210.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/210

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 14, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-8070

MARGARET L. JOHNSTON and PAUL E. FONTAINE, on
behalf of themselves and all others similarly situated,

        Petitioners

v.

HBO FILM MANAGEMENT, INC., a Delaware corporation;
ENTERTAINMENT FINANCE SERVICES, INC., a Delaware
corporation; HOME BOX OFFICE, INC., a Delaware
corporation; KIDDER, PEABODY & CO., INCORPORATED,
a Delaware corporation; and SMITH BARNEY, INC., a
Delaware corporation,

On Appeal from the United States District Court
for the Western District of Pennsylvania
(Docket No. 95-1300)
District Judge: Honorable William L. Standish

Argued August 2, 2001

BEFORE: BECKER, MANSMANN, and GREENBERG,
Circuit Judges

(Filed: September 14, 2001)

        Anthony P. Picadio (argued)
        Tybe A. Brett
        Picadio McCall Kane & Norton
        600 Grant Street
        4680 USX Tower
        Pittsburgh, PA 15219-2702

Thomas W. Henderson
3975 One Oxford Centre
300 Grant Street
Pittsburgh, PA 15219

 Attorneys for Appellants

Perry A. Napolitano (argued)
Gregory B. Jordan
Roy W. Arnold
Traci S. Rea
Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA 15219

 Attorneys for Appellees HBO Film
Management, Inc., Entertainment
Finance Services, Inc. and Home
Box Office, Inc.

David A. Brownlee
Kenneth M. Argentieri
Michael J. Lynch
David L. McClenahan (argued)
Charles M. Tea
Paul E. Del Vecchio
Kirkpatrick & Lockhart LLP
535 Smithfield Street
1500 Oliver Building
Pittsburgh, PA 15222-2312

 Attorneys for Appellees Kidder
Peabody & Co., Incorporated and
Smith Barney, Inc.

OPINION OF THE COURT

GREENBERG, Circuit Judge:

This case comes on before this court on an appeal from an order of the district court entered on November 22, 2000, denying a motion for class certification filed by plaintiffs Margaret Johnston and Paul Fontaine. The plaintiffs were investors in Cinema Plus, a limited

partnership formed to finance the production of motion pictures. They claim that the defendants made several fraudulent misrepresentations in the marketing of Cinema Plus, alleging various violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. SS 1961–1968, and state law claims. The plaintiffs filed a motion for class certification which the district court, adopting the report and recommendation of a magistrate judge, denied. For the following reasons, we will affirm the district court's order denying class certification.

I. BACKGROUND

Cinema Plus, a limited partnership, was formed in Delaware in 1987 to produce and distribute feature-length motion pictures. Defendants HBO Film Management, Inc. and Entertainment Finance Services, Inc. were general partners of Cinema Plus and, according to plaintiffs' complaint, defendant Home Box Office, Inc. was a "de facto" general partner of Cinema Plus. Defendants Kidder, Peabody & Co., Inc. and Smith Barney, Inc. marketed interests in Cinema Plus to the public.

The plaintiffs allege that the defendants made material misrepresentations in marketing interests in Cinema Plus. Specifically, the complaint claims that the brokers distributed uniform marketing materials to their sales representatives which, among other things, emphasized Michael Douglas's participation in the production of films, but failed to disclose that he was not under contract to produce any films for Cinema Plus.1 See App. at 1398–1400 (amended compl. P 21); id. at 1403–04 (amended compl. P 32). For instance, the marketing materials included such statements as:

> `Hell Drivers' to be produced by Michael Douglas/Michael Phillips, will be the first partnership production.

_____

1. The remainder of the amended complaint is devoted to allegations of misrepresentations regarding the relative risks involved in investing in Cinema Plus. See App. at 1395–98. The plaintiffs, however, say very little about these claims on this appeal, apparently choosing instead to focus on their misrepresentation claims regarding Michael Douglas.

3

Michael Douglas is the hottest name in Hollywood today, both as an actor who just won an Academy Award and a producer. He has just announced his newest production, `Hell Drivers,' and we own it!! That kind of sizzle will get every client's attention.

Investors `could more than double [their] money' or `earn a multiple of their investment' in three years through films produced by Michael Douglas, Michael Phillips, and Aaron Russo.

You know that Michael Douglas is one of the hottest producers today in the movie business. But did you know who was going to finance his next production? You are.

Michael Douglas does not realize his profits as a producer until the investor has been made whole.

Upside potential is a multiple of investment in three years through films by Michael Douglas, Michael Phillips, Aaron Russo and other top producers.

Id. at 1427–30. Similarly, the prospectus wrapper, a summary of information contained in the prospectus distributed to the brokers, included such statements as:

The Partnership has already signed three outstanding producers: Michael Douglas, Michael Phillips and Aaron Russo.

Cinema Plus has already contracted with three leading producers: Michael Douglas . . . , Michael Phillips . . . , and Aaron Russo . . . .

Cinema Plus, L.P. is committed to working exclusively with successful producers; only those with commercial track records will produce the Partnership's films. The Partnership has already signed Agreements with Michael Phillips and Michael Douglas, through their partnership, Mercury/Douglas Films . . . .

The producers already under contract to the Partnership are responsible for a succession of hits that have helped fuel revenue growth in the motion picture industry.

4

Id. at 106-07; id. at 111. The sales representatives purportedly relied upon these materials and represented to the plaintiffs that Michael Douglas would produce two to four films for Cinema Plus. The brokers, however, did not disclose the alleged falsity of their statements.

Further, the plaintiffs claim written materials distributed to the investors, namely the prospectus, created a false and misleading impression, not otherwise rebutted, that Michael Douglas was committed to produce films for Cinema Plus. The prospectus states, in relevant part, that:

> The Partnership has contracted for Michael S. Phillips and Michael Douglas to render producing services for a minimum of two and a maximum of four feature-length motion pictures for the Partnership.
>
> . . .
>
> Either Mr. Phillips and/or Mr. Douglas will be actively involved in a production capacity in all phases of production of all Partnership Films produced under the Mercury/Douglas Agreement.

Id. at 158, 173. The plaintiffs allege they relied detrimentally on their brokers' misrepresentations and omissions of material information as well as those in the prospectus, in investing in Cinema Plus.

In fact, Michael Douglas did not produce any films for Cinema Plus, although the limited partnership did finance and market four films. The films were largely unsuccessful financially, however, resulting in a loss for the partnership, and ultimately, this lawsuit.

The plaintiffs' original complaint stated four counts, alleging one claim arising under RICO, with the predicate offenses of securities fraud, and state law claims for breach of fiduciary duty, negligent misrepresentation and deceptive business practices. The defendants filed motions to dismiss the complaint which, in a report and recommendation filed on January 30, 1996, a magistrate judge recommended be granted. After objections were filed, the district court adopted the magistrate judge's recommendations and granted the defendants' motions. The plaintiffs then appealed to this court.

5

On appeal, we reversed the district court's order as we found that the facts alleged in the complaint stated a claim under RICO. See Johnston v. HBO Film Mgmt., Inc. , 129 F.3d 1255 (3d Cir. 1997) (table). In our opinion, we summarized the plaintiffs' claims:

> In short, plaintiffs allege that the appellees misrepresented that Cinema Plus was a safe and prudent investment when, in reality, (1) its primary purpose was to generate large commissions and fees and create opportunities for self-dealing for the defendants and (2) the `protection' of the [Assured Return of Film Payments] was merely an illusory benefit that obfuscated the risky nature of the investment defendants were marketing.

Appellants' Br. Ex. A at 3 (magistrate judge's report & recommendation). We, however, expressly did not address the plaintiffs' claims regarding misrepresentations about Michael Douglas's participation in Cinema Plus, finding them to be outside the scope of our analysis. See id. at 3-4.

On remand, the defendants filed renewed motions to dismiss, which the district court denied. Thereafter, plaintiffs filed an amended complaint alleging the same four counts. Then, they filed a motion for class certification, which, in a report and recommendation filed October 18, 2000, the magistrate judge recommended be denied. On November 22, 2000, the district court adopted the recommendation and denied the plaintiffs' motion.

Therefore, on December 7, 2000, plaintiffs filed a petition for permission to appeal from denial of class certification, pursuant to Fed. R. Civ. P. 23(f). By order dated December 29, 2000, a motions panel of this court denied plaintiffs' petition. See App. at 32. Then, on January 16, 2001, plaintiffs filed a petition for rehearing. On March 15, 2001, the motions panel vacated its earlier order and referred plaintiffs' petition to a merits panel. See id. at 20. Thereafter, on August 1, 2001, in light of our decision in Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., No. 00-1586, ___ F.3d ___, 2001 WL 877524, at * 1-3 (3d Cir.

6

Aug. 6, 2001), we granted the plaintiffs' petition for leave to appeal.2

II. DISCUSSION

In assessing whether the district court erred in denying plaintiffs' motion for class certification, we apply the abuse of discretion standard.3 See In re LifeUSA Holding Co., Inc., 242 F.3d 136, 143 (3d Cir. 2001); Holmes v. Pension Plan of Bethlehem Steel Corp., 213 F.3d 124, 136 (3d Cir. 2000). A district court abuses its discretion if its decision " `rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact.' " Newton, 2001 WL 877524, at *3 (quoting In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 783 (3d Cir. 1995)).

To obtain class certification, plaintiffs must establish all four elements of Rule 23(a) along with one provision of Rule 23(b). See Georgine v. Amchem Prods., Inc., 83 F.3d 610, 624 (3d Cir. 1996); Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 248 (3d Cir. 1975). Rule 23(a) requires a showing of: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.4 See Fed. R. Civ. P. 23(a);

_____

2. In 1998, the Supreme Court added a provision to Rule 23, governing class actions, permitting interlocutory appeal of decisions granting or denying class certification at a court of appeals' discretion. Recently, in Newton, we considered the standards for granting a petition to appeal class certification decisions under Fed. R. Civ. P. 23(f). See Newton, 2001 WL 877524, at * 1-3. We indicated that a petition to appeal should be granted to permit the court to address "the possible case-ending effect of an imprudent class certification decision (the decision is likely dispositive of the litigation)," or an erroneous ruling by the district court, or where review would facilitate development of the law on class certification. Id. at *3. Additionally, inasmuch as the court has the authority to grant or deny petitions "on the basis of any consideration that [it] finds persuasive," Fed. R. Civ. P. 23(f) committee note, the court may exercise its discretion and grant interlocutory review outside of these circumstances should it find other valid reasons for doing so. See id.

3. The district court had jurisdiction over this matter pursuant to 28 U.S.C. S 1331 and we have jurisdiction pursuant to 28 U.S.C. S 1292(e) and Fed. R. Civ. P. 23(f).

4. Rule 23(a) provides:

     One or more members of a class may sue or be sued as

Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613, 117
S.Ct. 2231, 2245 (1997). If these requirements are satisfied,
the court also must find that the class action is
maintainable under Rule 23(b)(1), (2) or (3). See Fed. R. Civ.
P. 23(b). In this case, the plaintiffs sought certification
pursuant to Rule 23(b)(3), which requires that "questions of
law or fact common to the members of the class
predominate over any questions affecting only individual
members, and that a class action is superior to other
available methods for the fair and efficient adjudication of
the controversy." Id.

In analyzing plaintiffs' motion, the magistrate judge
found that the plaintiffs failed to satisfy the "predominance"
requirement for class certification under Rule 23(b)(3). The
district court did not address expressly the certification
requirements of Fed. R. Civ. P. 23(a) or the superiority
element of Rule 23(b)(3). Nevertheless, because satisfaction
of each of the Rule 23 criteria is a necessary prerequisite to
class certification we address each criterion in turn.

A. Fed. R. Civ. P. 23(a)

1. Numerosity

To begin, proper class certification requires a finding of
numerosity, or that the putative class is "so numerous that
joinder of all members is impracticable." Fed. R. Civ. P.
23(a)(1). Here, inasmuch are there are thousands of
potential class members, joinder would be impracticable,
thereby satisfying this criteria.

2. Commonality

Second, the district court must find commonality, or that
"there are questions of law or fact common to the class."

_____

representative parties on behalf of all only if (1) the class is so
numerous that joinder of all members is impracticable, (2) there
are
questions of law or fact common to the class, (3) the claims or
defenses of the representative parties are typical of the claims or
defenses of the class, and (4) the representative parties will
fairly
and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Fed. R. Civ. P. 23(a)(2). Commonality does not require an identity of claims or facts among class members; instead, "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." In re the Prudential Ins. Co. of Am. Sales Practices Litig. , 148 F.3d 283, 310 (3d Cir. 1998); Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir. 1994). In this case inasmuch as the question of whether the defendants fraudulently misrepresented the role of Michael Douglas in Cinema Plus is a factual and legal claim common to the entire class this criterion also is met.

3. Typicality

Third, in a properly certified class, the claims of the class representatives must be typical of the class as a whole. See Prudential, 148 F.3d at 310. In considering the typicality issue, the district court must determine whether "the named plaintiff[s'] individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir. 1985) (internal quotations omitted). This criteria does not require that all putative class members share identical claims. Indeed, so long as "the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." Newton, 2001 WL 877524, at *17 (citing Barnes v. Am. Tobacco Co., 161 F.3d 127, 141 (3d Cir. 1998)); Baby Neal, 43 F.3d at 58 ("Commentators have noted that cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims."). Here, because the claims of the plaintiffs and the putative class members all arise from the alleged misrepresentations by the defendants, the claims of the plaintiffs are typical of those of the class.

4. Adequacy of Representation

Fourth, class representatives must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

9

In analyzing this criteria, the court must determine whether the representatives' interests conflict with those of the class and whether the class attorney is capable of representing the class. See Amchem, 521 U.S. at 625–26, 117 S.Ct. at 2250–51; Gen. Tel. Co. v. Falcon, 457 U.S. 147, 157 & n.13, 102 S.Ct. 2364, 2371 & n.13 (1982); Newton, 2001 WL 877524, at *18. Under the facts as described by the parties, there are no foreseeable conflicts between the named and putative plaintiffs. Further, there is no reason to conclude that counsel would not suitably represent the class. Accordingly, we find that this criterion, and therefore all of the elements of Rule 23(a), are met.

B. Fed. R. Civ. P. 23(b)

Class certification also must satisfy the requirements of Rule 23(b), specifically here the predominance and superiority requirements of Rule 23(b)(3). Predominance requires "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Superiority mandates that the district court determine that the class action is the best method of fairly and efficiently resolving the controversy. See id. To assist the court in analyzing cases for predominance and superiority, Rule 23(b)(3) includes a nonexclusive list of relevant factors to consider:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Id. Overall, as we have recognized repeatedly, "[i]ssues common to the class must predominate over individual issues, and the class action device must be superior to other means of handling the litigation." Newton, 2001 WL 877524, at *19; Prudential, 148 F.3d at 313–14.

10

1. Predominance

The district court denied the plaintiffs' motion for class certification based on its conclusion that individual issues predominated over issues common to the class. See Appellants' Br. Ex. A at 7 (magistrate judge's report & recommendation). The court found that while the complaint alleged that the prospectus and prospectus wrapper contained representations that Michael Douglas would produce between two and four movies for Cinema Plus, the evidence indicated the plaintiffs' claims actually were based on alleged oral misrepresentations.5 See id. The question, then, was whether affirmative misrepresentations were made to particular investors, an inquiry that necessarily involves an individual review of what each investor was told and what information was provided. See id. at 8. To that end, the case was distinguishable from Prudential, 148 F.3d 283, where we upheld the certification of a class alleging fraudulent insurance sales practices. See Appellants' Br. Ex. A at 8 (magistrate judge's report & recommendation). Moreover, because the plaintiffs claimed affirmative oral misrepresentations, as opposed to omissions, determining reliance necessarily required an individualized assessment. See id. Finally, because issues of reliance and causation predominated in the case, there would be "insurmountable manageability problems" if it proceeded to trial. Id. at 9.

The soundness of the district court's decision turns on two considerations: first, whether it was appropriate to look beyond the plaintiffs' pleadings that alleged the defendants made uniform oral and written misrepresentations and determine whether the record supported their claims, and

_____

5. The court also questioned, based on the representations made in the prospectus and prospectus wrapper, whether the plaintiffs stated a misrepresentation claim at all. See Appellants' Br. Ex. A at 7 & n.2 (magistrate judge's report & recommendation). Specifically, the court looked to the prospectus and found that, when read as a whole, it was clear that it stated that either Michael Douglas or Michael Phillips would produce at least two movies for Cinema Plus. See id. at 7. Because Michael Phillips indeed produced two movies for the partnership, the court doubted whether there had been a misrepresentation. But, because the defendants had not moved for summary judgment, the court declined to decide the matter on this basis. See id.

11

second, whether the court determined correctly that reliance could not be presumed.

As to the first issue, plaintiffs contend that class issues predominate because the defendants made uniform oral and written misrepresentations. Specifically, they point to the prospectus and argue that because they, as investors, are presumed to have read these materials, the defendants made uniform misrepresentations to all putative class members. Further, they point to the prospectus wrapper and other uniform internal marketing materials distributed to the brokers that also contain misrepresentations, and claim the brokers relied upon them in making substantially similar and misleading sales recommendations. The evidence of record, however, simply does not support the plaintiffs' claims.

The issue, then, is whether in making a class certification decision the court must take as true the allegations in the complaint where those allegations are unsupported, and in some instances rebutted, by a well-developed record. Specifically, we must decide whether the district court erred in finding that notwithstanding plaintiffs' claim that the brokers, relying upon uniform sales materials, made materially similar misrepresentations, that plaintiffs' case actually is based on individualized misrepresentations. Recently, we addressed an issue of this nature in Newton and held that "[i]n reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action." Id. at 5; see Falcon, 457 U.S. at 160, 102 S.Ct. at 2372 (stating "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question"). In Newton, faced with claims of a "common scheme" of misrepresentation constituting a Rule 10b-5 private securities fraud claim, we held that the case presented an instance in which the court must probe beyond the surface of plaintiffs' allegations. See id.

We began our analysis by examining the elements of the underlying cause of action, noting that such an analysis is critically important to the predominance determination under Rule 23(b)(3). See id. at *8. This is so because:

12

the elements of the Rule 10b-5 claim which remain in dispute, requiring proof of individualized reliance and injury from each member of the proposed plaintiff class effectively would prevent plaintiffs from proceeding with a class action, since individual issues then would overwhelm the common ones. On the other hand, presuming these elements would resolve the problem of balancing the substantive requirement of proof of reliance and injury in securities cases against the procedural requisites of Federal Rule of Civil Procedure 23. If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable.

Id. (internal quotations and citations omitted). Then, in considering the elements of reliance and economic injury, we looked to the parties' evidence and concluded, despite plaintiffs' allegations that they had suffered economic injury, that the plaintiffs were not entitled to a presumption of class-wide injury. See id. at *15. Accordingly, we found that because each individual claim would have to be examined to ascertain whether or not there was injury, individual issues overwhelmed common questions among the class. See id. at *19. We therefore held that class certification inappropriate. See id. at *24.

Our decision in In re LifeUSA Holding Inc., 242 F.3d 136, also is instructive. There, the district court certified a class of plaintiffs who had purchased annuity policies based on the court's finding that "the gravamen of plaintiffs' claims is that Defendant's sales techniques and advertising constituted an allegedly fraudulent scheme." Id. at 138. However, on appeal and for the first time, plaintiffs argued their claims were not based on the sales presentations made by the defendant's agents, but rather were predicated on post-sale fraud and misconduct. See id. We therefore vacated the district court's certification order and remanded the matter for a redetermination of the issue utilizing the proper post-sale fraud allegations. See id.

Nevertheless, we addressed the merits of the district court's certification decision. See id. at 143-50. In doing so, we first focused on whether there was predominance, and therefore commonality, among the plaintiffs' claims. See

13

id. at 144-45 ("Because common questions (commonality) must be established before predominance can be found, we turn to that element."). Relying on Georgine and Barnes, two mass-tort cases, we noted that class certification was inappropriate in cases that present individualized issues of liability. See id. at 145 (citing Georgine, 83 F.3d at 610; Barnes, 161 F.3d at 149). In Georgine, which involved certification of a nationwide settlement class of persons exposed to asbestos, we held that the predominance requirement was not satisfied because "each individual plaintiff 's claim raises radically different factual and legal issues from those of other plaintiffs." Georgine, 93 F.3d at 618. Similarly, in Barnes we affirmed the decertification of a class of cigarette smokers who asserted claims against a cigarette manufacturer, finding that the individual issues involved made class treatment inappropriate. See Barnes, 161 F.3d at 149.

Applying these principles, in LifeUSA we found that commonality did not exist, and therefore common questions could not predominate over individual issues. See LifeUSA, 242 F.3d at 147. We stated that the plaintiffs' claims arose "not out of one single event or misrepresentation, but claims allegedly made to over 280,000 purchasers by over 30,000 independent agents where the District Court found that the sales presentations (hence the alleged misrepresentations) were neither uniform nor scripted." Id. at 145-46.

Further, we found that the district court's reliance on Prudential was "misplaced and unfortunate" as the factual backgrounds, as demonstrated through depositions, affidavits and declarations, were markedly different. Id. Unlike in Prudential, the annuity in LifeUSA was not sold according to standard, uniform, scripted sales presentations. Compare In re the Prudential Ins. Co. of Am. Sales Practices Litig., 962 F. Supp. 450, 514 (D.N.J. 1997), with LifeUSA, 242 F.3d at 146. Further, the LifeUSA annuities were sold by independent agents who learned about the annuity from written materials, some of which were not uniform or generated by the defendant, and from voluntary defendant-sponsored seminars. See LifeUSA, 242 F.3d at 146. Moreover, selling agents did not utilize the

14

marketing materials uniformly; some agents discarded the materials entirely while others tailored their presentations to each customer's objectives. See id.

Finally, the plaintiffs testified that if they received information from the sales agents prior to purchasing annuities, they neither relied upon nor recalled its substance. See id. Therefore, we found the record to be "uncompromising in revealing non-standardized and individualized sales `pitches' presented by independent and different sales agents, all subject to varying defenses and differing state laws, thus making certification of individualized issues inappropriate." Id. at 147. Thus, we vacated the district court's certification order. See id. at 148.

In Szabo v. Bridgeport Machines, Inc., 249 F.3d 672 (7th Cir. 2001), the Court of Appeals for the Seventh Circuit helpfully discussed the issue before us. There, the district court certified a nationwide class of persons who had purchased machine tools manufactured by defendant, alleging that the defendant, through its agents, fraudulently represented the tools' abilities and limitations. See id. at 673. In doing so, the district court assumed that because "class determination is made at the pleading stage of the action, the substantive allegations in the complaint are accepted as true for purposes of the class motion." Id. at 675. Therefore, the district court rejected the defendant's argument that because plaintiff 's claim was based on oral misrepresentations, which would be different for each potential class member, certification was inappropriate. See id.

On appeal, the court of appeals held that "[b]efore deciding whether to allow a case to proceed as a class action . . . a judge should make whatever factual and legal inquiries are necessary under Rule 23." Id.  at 676. The Supreme Court had recognized in Falcon that"sometimes it may be necessary for the court to probe beyond the pleadings before coming to rest on the certification question . . . . [A]ctual, not presumed conformance with Rule 23(a) remains . . . indispensable." Falcon, 457 U.S. at 160, 102 S.Ct. at 2372. The Szabo court found the same to be true for Rule 23(b) as "[c]ertifying classes on the basis of

15

incontestable allegations in the complaint moves the court's discretion to the plaintiff 's attorneys--who may use it in ways injurious to other class members, as well as ways injurious to defendants." Szabo, 249 F.3d at 677. Therefore, the court vacated the district court's certification order, finding "[n]agging issues of choice of law, commonality, and manageability beset this case" as "[i]t is unlikely that dealers in different parts of the country said the same things to hundreds of different buyers." Id.

Turning to this case, it is apparent that not only was it appropriate, but also necessary, for the district court to examine the factual record underlying plaintiffs' allegations in making its certification decision. See Newton , 2001 WL 877524, at *5; LifeUSA, 242 F.3d at 145-48; see also Szabo, 249 F.3d at 676. Further, applying the framework utilized in Newton, it is clear the district court did not abuse its discretion in finding that the record failed to establish that common issues predominated over individual issues in the case.

Similar to Newton, this case involves private securities fraud claims under the Securities Exchange Act of 1934, 15 U.S.C. S 78j(b), although here they are raised as predicate acts under RICO. In order to establish their claims, plaintiffs must show that the defendants made misstatements or omissions of material fact, with scienter, in connection with the purchase or sale of securities, and that the plaintiffs injuriously relied on the misstatements or omissions. See, e.g., Weiner v. Quaker Oats Co., 129 F.3d 310, 315 (3d Cir. 1997); Kline v. First W. Gov't Securities, Inc., 24 F.3d 480, 487 (3d Cir. 1994). As proof of two of these essential elements requires individual treatment, we conclude class certification is unsuitable. See Newton, 2001 WL 877524, at *8.

First, plaintiffs allege the defendants made uniform oral and written misrepresentations. They point to the prospectus as evidence of a uniform written misrepresentation made to all plaintiffs. Further, relying on the marketing materials and prospectus wrapper, they contend that these uniform written materials establish that the brokers' statements were uniform, as the brokers certainly must have relied upon these materials in making

16

their sales presentations. The problem, however, is that the record simply does not support these claims.

When the court made its certification decision it had deposition testimony or affidavits from each of the plaintiffs, several brokers, and a Cinema Plus investor other than the plaintiffs. At his deposition, plaintiff Fontaine testified that he did not know whether he ever had received a prospectus, but that even if he had, he had not read it. See App. at 573; id. at 645. Further, he testified that he made the decision to invest in Cinema Plus as a result of one to four conversations with his broker, but he does not recall what his broker told him about Cinema Plus. He testified, "I don't remember specifically what he said, but he must have mentioned to me about Cinema Plus, Michael Douglas, the amount of money I can make, double my money in three or four years. Michael Douglas was the big guy involved with this." Id. at 566-67. The deposition continued with defendants' counsel asking, "So what you remember about what he said concerning Michael Douglas was that he was the big guy and the person that was going to push this?" and Fontaine answering, "I assume that he meant to promote these movies and even act in them, I assumed." Id. at 567. Moreover, Fontaine denied having heard several representations alleged in the complaint to have been made as part of a uniform script read to investors pertaining to the risks involved in the investment. See id. at 599-603.

Similarly, plaintiff Johnston testified at her deposition that she did not recall whether she received a Cinema Plus prospectus, and that if she had, she never read it. See id. at 855; id. at 873-74; id. at 891-93. Johnston did testify unequivocally, however, that her broker stated that Michael Douglas was going to produce movies for Cinema Plus. See id. at 849. But, she testified that she did not discuss the relative investment risks with her broker because he knew her individual tastes well enough to know that she would not want to take a risk. See id. at 933.

Johnston's broker, Robert Kaiser, testified that he received some, but not all, of the alleged uniform sales materials, but that he did not read from or rely upon these materials in making investment recommendations. See id.

17

at 1029–30; id. at 1031–32; id. at 1071–72. He testified that instead his "typical practice [was] to make a list of bullet points describing the pros and cons and to go over those with a person," the information for which was derived from marketing materials, scripts and prospectuses. Id. at 1009. Nevertheless, he testified that he told Johnston that Michael Douglas was going to produce two or more movies, which was an important consideration regarding Cinema Plus's investment potential. See id. at 77–80; id. at 93–95.

There were also affidavits before the court from several brokers who sold units of Cinema Plus stating that they did not use a standardized script or a uniform presentation in selling shares of Cinema Plus. See id. at 1387 (Aff. of John Jaeger) (stating his "presentation to various customers with respect to Cinema Plus varied depending on the individual circumstances of the customer and [his] relationship with that customer."); id. at 1390 (Aff. of David Sysko) (same); id. at 1392 (Aff. of Randall Carter) (same). Additionally, their discussions with respect to Cinema Plus varied from customer–to–customer depending on the questions and comments of the customer. See id.

Finally, the court considered the affidavit of James Gleason, a Cinema Plus investor. He stated expressly that he did not base his decision to invest in Cinema Plus on the likelihood that a particular producer would produce movies for the partnership. See id. at 1379–80. Therefore, the record from the plaintiffs' viewpoint is at best inconclusive as to whether the defendants made uniform oral representations in selling units of Cinema Plus.

In cases raising issues similar to those here, it has become well–settled that, as a general rule, an action based substantially on oral rather than written communications is inappropriate for treatment as a class action. See, e.g., LifeUSA, 242 F.3d at 145–46; Simon v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 482 F.2d 880, 882 (5th Cir. 1973); Glick v. E.F. Hutton & Co., Inc., 106 F.R.D. 446, 449 (E.D. Pa. 1985). For example, in Seiler v. E.F. Hutton & Co., 102 F.R.D. 880, 889 (D.N.J. 1984), the court rejected as insufficient plaintiffs' allegations that the brokers allegedly relied upon uniform marketing materials because the record revealed that individual brokers made individual

18

decisions about upon what to rely and what to say to customers.

Therefore, it is clear that the district court did not abuse its discretion in finding that individual issues overwhelmed issues common to the class with regard to the element of a misstatement or material omission. We reach this conclusion notwithstanding plaintiffs' reliance on Prudential. The plaintiffs claim that the district court erroneously distinguished Prudential on the ground that it did not involve affirmative misrepresentations. Indeed, it does appear that the district court took this clearly unsupported view of Prudential in distinguishing it from the present case. Compare Prudential, 148 F.3d at 310 n.48 (finding certification of settlement class was appropriate where allegedly improper sales practices were carried out by use of "substantially similar, and sometimes identical oral and written misrepresentations," "the required use of pre-approved written marketing materials," and material omissions), with Appellants' Br. Ex. A at 8 (magistrate judge's report & recommendation) (stating Prudential involved only failure to disclose material facts and allegations that specific information was withheld from all investors). Nevertheless, the district court did not abuse its discretion in finding that Prudential was distinguishable.

Prudential involved uniform, scripted and standard sales presentations by the defendants. See id. at 310-11. Indeed, in Prudential the district court found specifically that "the oral component of the fraudulent sales presentations did not vary appreciably among class members." Prudential, 962 F. Supp. at 514. Moreover, the agents in Prudential were career agents who worked exclusively for and were trained uniformly by Prudential, and who relied on uniform sales materials. See id. at 514-15. Here, however, the plaintiffs did not establish that Cinema Plus units were sold according to standard, uniform, scripted sales presentations. This much is apparent from the starkly different accounts of plaintiffs Johnston and Fontaine as to how and why they came to invest in Cinema Plus. Further, the brokers denied using uniform presentations, and more importantly, there is no evidence that, other than Kaiser and Fontaine's broker, any made the alleged

19

misrepresentation about Michael Douglas at all. Finally, Johnston and Fontaine both testified that if they received written sales information or prospectuses from defendants prior to purchase, they did not rely on them, nor could they recall their substance. In this sense, this case is very similar to LifeUSA, where we held Prudential was distinguishable. See LifeUSA, 242 F.3d at 146. So, too, do we here.

We have not overlooked our statement in Prudential that:

> While individual questions may arise during the course of this litigation, we agree with the district court that the presence of individual questions does not per se rule out a finding of predominance. In particular, the `presence of individual questions as to the reliance of each investor does not mean that the common questions of law and fact do not predominate.' Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir. 1985).

Prudential, 148 F.3d at 315. Here, however, we do not know the content of the individual representations as they were not standard or scripted but were oral and varied. Moreover, we do not know whether or to what extent the representations facilitated the sales of Cinema Plus units. In the circumstances, we cannot say "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Rule 23(b)(3). We emphasize this point to demonstrate that we are in no sense undermining Prudential.

In addition to finding this case presented individual questions regarding the alleged misrepresentations, the district court found this case involved individual questions of reliance. The plaintiffs dispute this finding, arguing instead that they are entitled to a presumption of reliance.6

_____

6. In addition to the argument described below, plaintiffs contend they are entitled to a presumption of reliance based on the "fraud of the market" theory. See Peil v. Speiser, 806 F.2d 1154, 1161 (3d Cir. 1986). The plaintiffs concede that the traditional fraud on the market theory, which applies where securities are traded on an open and developed market and the market price of the securities incorporates the misrepresentations, "does not technically apply here." Appellants' Br. at

In Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54, 92 S.Ct. 1456, 1472-73 (1972), the Supreme Court held that in cases seeking to predicate Rule 10b-5 liability upon omissions, reliance will be presumed from the materiality of the information not disclosed. Conversely, no presumption arises in cases of alleged misrepresentations. See id.; Sharp v. Coopers & Lybrand, 649 F.2d 175, 187 (3d Cir. 1981).7 The Court did not address, however, those situations involving both misrepresentations and omissions.

Then, in Sharp, we held that in cases involving both omissions and misrepresentations, the "proper approach to the problem of reliance is to analyze the plaintiff 's allegations, in light of the likely proof at trial, and determine the most reasonable placement of the burden of proof of reliance." Id. at 188. Otherwise, to maintain in these cases an omission-misrepresentation dichotomy "would require the trial judge to instruct the jury to presume reliance with regard to omitted facts, and not to presume reliance with regard to the misrepresented facts." Id. By examining the plaintiffs' allegations and likely proof, however, the court can decide, on a case by case basis, whether the offenses can be characterized primarily as omissions or misrepresentations, and therefore who most appropriately bears the burden of proof. See id.

Applying the foregoing methodology, we concluded in Sharp that plaintiffs were entitled to a presumption of reliance. See id. at 189. There, plaintiffs brought a securities fraud action against an accounting firm that issued an opinion letter containing representations about the deductibility of an investment. See id. at 178. The court found that the opinion letter was intended to influence the decisions of persons interested in the investment, and that

_____

34. Nevertheless, they urge us to expand the theory to instances, such as here, where the investment was sold during a closed period and the initial price was set by the issuer rather than the market. See id. We need not address this issue, however, as plaintiffs failed to raise it before
the district court.

7. Sharp has been overruled on grounds not material here. See McCarter v. Mitcham, 883 F.2d 196, 202 (3d Cir. 1989).

the defendant undoubtedly foresaw that it would have that effect. See id. at 189. Because the defendant "facilitated the transactions at issue but failed to disclose certain facts," and considering the likelihood that investors would rely on the opinion letter, the court held that the burden of proving reliance appropriately was placed on defendant. See id.

Similarly, in Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186, 202–03 (3d Cir. 1990), we applied the Sharp analysis and concluded the plaintiffs were entitled to a presumption of reliance. We found the case was predicated on two allegedly fraudulent courses of conduct by defendant: the failure to disclose excessive markups in their purchases and sales of various penny stocks and the failure to clarify true but misleading statements made about its research department, namely that the department consisted of one person who assembled information only about companies whose securities the defendant had underwritten. See id. at 202. The first of defendant's actions involved pure omissions, making the Affiliated Ute presumption fully applicable. See id. The second action involved half-truths, which we held were "obviously closer to omissions than are `pure' misrepresentations," and that would foreseeably influence investors' decisions. Id. Therefore, we held the district court did not err in"excusing plaintiffs from their burden of proving reliance on those nondisclosures and half-truths." Id.

More recently, in Joseph v. Wiles, 223 F.3d 1155, 1162–63 (10th Cir. 2000), the Court of Appeals for the Tenth Circuit addressed the issue, holding the plaintiff was not entitled to a presumption of reliance. The plaintiff, an aftermarket purchaser of debentures, brought a securities fraud action alleging the seller misrepresented its financial outlook and disseminated false information about the company. See id. at 1162. The court expressly adopted the Sharp analysis and "analyze[d] the complaint to determine whether the offenses it alleges can be characterized primarily as omissions or misrepresentations in order to determine whether the Affiliated Ute presumption should apply." Id. In doing so, the court noted that the analysis was easier to describe than to apply because "every misstatement both advances false information and omits

22

truthful information. Statements which are technically true may be so incomplete as to be misleading (e.g., half-truths or distortions)." Id.

Nevertheless, keeping in mind the principle that the "presumption of reliance exists in the first place to aid plaintiffs when reliance on a negative would be practically impossible to prove," the court looked at the allegations in the complaint and found that the plaintiff primarily alleged misrepresentations. Id. at 1162-63. For example, the complaint alleged that the defendant "consistently omitted to disclose that its financial statements had been falsified and that its sales, revenues, assets and shareholders' equity had been artificially inflated. Defendants concealed the existence of the unlawful scheme and the acts of manipulation committed pursuant thereto." Id. at 1163.

Finally, the court concluded by noting that "[a]ny fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself," and that the mere fact of this concealment cannot, and should not, transform a misrepresentation into an omission. Id. "To do otherwise would permit the Affiliated Ute presumption to swallow the reliance requirement almost completely." Id.

Applying Sharp to this case, we find that plaintiffs' allegations are based on misrepresentations, rather than omissions, by defendants. Their primary claim is that the defendants misrepresented that Michael Douglas would participate in the production of two to four films for Cinema Plus. This claim should not be transformed into an omission simply because the defendants failed to disclose that the allegedly misleading fact was untrue. Under an approach of that nature nearly any misrepresentation could become an omission, which, as the Joseph court noted, would allow the presumption to swallow the reliance requirement almost completely. See id. Further, the omission alleged would have no impact absent the misrepresentation, or in other words, a misrepresentation is necessary to create the specific expectation that the omission does not negate. Here, defendants' failure to inform plaintiffs that Michael Douglas was not under contract to produce movies for Cinema Plus is meaningless without the representation that Douglas would produce

23

movies. Finally, this case is not one where reliance would be difficult for the plaintiffs to prove, while it would be extraordinarily difficult for the defendants to disprove, as presumably plaintiffs know whether they acted on or as a result of the information made available to them.

We emphasize that in reaching our result we have taken into account our decisions in Sharp and Hoxworth. There, we were presented with situations similar to that here, namely failures to clarify misleading statements, but held that the plaintiffs were entitled to a presumption of reliance. See Hoxworth, 903 F.2d at 202; Sharp, 649 F.2d at 189. In so holding, we looked to whether the defendants' actions facilitated the transactions, and whether it was foreseeable that defendants' actions would influence the plaintiffs' decisions. See Hoxworth, 903 F.2d at 202; Sharp, 649 F.2d at 189. Here, arguably defendants' representations that Michael Douglas would produce two to four films facilitated the sale of Cinema Plus units and influenced plaintiffs to invest therein. However, Sharp and Hoxworth are distinguishable in that in both cases we found the alleged misstatements and half-truths were uniform. In Hoxworth, the defendant's brokers "were trained to solicit new business in a carefully scripted sequence of three consecutive phone calls made to prospective customers." Hoxworth, 903 F.2d at 192. Similarly, in Sharp, all of the plaintiffs received the misleading opinion letter written by defendant. See Sharp, 649 F.2d at 178. Here, there is neither a finding, nor evidence upon which we reasonably could find, that the brokers utilized, and the plaintiffs received, a uniform sales pitch or uniform representations regarding investing in Cinema Plus. Therefore, it is questionable whether, or to what extent, the alleged misrepresentation facilitated or influenced the sales of Cinema Plus units. Accordingly, we find that the district court did not err in concluding plaintiffs were not entitled to a presumption of reliance, and therefore did not abuse its discretion in concluding the plaintiffs failed to establish the predominance requirement of Rule 23(b).

2. Superiority

In light of the foregoing discussion, we need not discuss the superiority requirement at length. A class action must

24

represent the best "available method[ ] for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). It is within this requirement that the court should address "the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3)(D). The district court concluded that given the individualized nature of proving misrepresentations and reliance, the case would present "unsurmountable" manageability problems. The court found that "[a]ssuming that the representative plaintiffs are typical of all plaintiffs, individual inquiry would be necessary with respect to each class member concerning their receipt of the prospectus, whether they read it, and whether they relied upon it." Appellants' Br. Ex. A at 9 (magistrate judge's report & recommendation). Because of the number of potential class members, the court held that a trial involving this amount of individual inquiry would be impracticable. See id. at 10. As the foregoing discussion demonstrates, we conclude the district court did not abuse its discretion in reaching this decision. Trial of this case would involve essentially countless mini-trials to determine what alleged misrepresentation was made to each individual plaintiff, whether that person relied upon the statement, and the applicability of any defenses. Obviously, establishing proof of each of these elements and defenses would present severe manageability problems for the court.

III. CONCLUSION

In sum, we affirm the district court's order entered November 22, 2000, denying class certification. Although the plaintiffs allege uniform written and oral misrepresentations by defendants, they failed to substantiate their claims. Further, the district court properly concluded plaintiffs were not entitled to a presumption of reliance. Therefore, adjudication of plaintiffs' claims necessarily would require an individualized analysis of each claim, including the form of the misrepresentation, whether it was relied upon, and the availability of any defenses. Clearly, individual issues predominate over issues common to the class and the class action is not the superior method of adjudicating this case.

25

Therefore the district court did not abuse its discretion in denying certification here.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

26