Raymond and Gurda **CHARLESWELL,** Marsha Christian, Jacqueline Jeffries, Marilyn A. Creque, Jean S. Maynard, Hollister Pierre and Verdine Pierre, Plaintiffs,

v.

**CHASE MANHATTAN BANK, N.A.,** Chase Manhattan Mortgage Corporation and Chase Agency Services, Inc., Defendants/Third–Party Plaintiffs,

Certain Interested Underwriters at Lloyd's London, Third– Party Defendant.

Civil Action No. 01–119.

District Court, Virgin Islands, D. St. Croix.

Aug. 6, 2004.

A. Jeffrey Weiss, Terrence Buehler, Janet Reed, for plaintiffs.

Nancy V. Young, George H. Logan, Christiansted, Virgin Islands, Leann Pedersen Pope, Burke, Warren, MacKay & Serritella, P.C., Chicago, IL, John A. Zebedee, Matthew L. Litsky, Phelps, Dunbar LLP, Tampa, FL, for defendants.

## MEMORANDUM

DuBOIS, District Judge.

Presently before the Court are plaintiffs' Motion for Class Certification (Document No. 13, filed November 16, 2001) and supporting Memorandum of Law (Document No. 14, filed November 16, 2001), and related submissions, and Chase Defendants' Motion to Strike Certain Arguments in Plaintiffs' Reply Memorandum in Support of Their Motion for Class Certification (Doc. No. 89, filed February 18, 2003), and related submissions. A hearing and oral argument on the Motion for Class Certification was held on April 14, 2004. Following oral argument, the parties submitted supplemental memoranda to the Court. Upon review of the submissions of the parties, the Court denies plaintiffs' Motion for Class Certification without prejudice because, on the current state of the record, common questions of law and fact do not predominate over individual questions. Chase Defendants' Motion to Strike Certain Arguments in Plaintiffs' Reply Memorandum is also denied on the ground that defendants had an opportunity to respond to the arguments and failed to establish any prejudice.

## I. *PROCEDURAL HISTORY*

This class action arises out of claims by plaintiffs, Raymond and Gurda Charleswell, Marsha Christian, Jacqueline Jeffries, Marilyn A. Creque, Jean S. Maynard, Hollister Pierre and Verdine Pierre ("plaintiffs"), and a putative class of 989 Virgin Islands real property owners against defendants, Chase Manhattan Bank, N.A. ("Chase"), Chase Manhattan Mortgage Corporation ("CMMC"), and Chase Agency Services, Inc. ("CAS") (collectively "defendants"), for recovery of millions of dollars in insurance coverage for damage to their property in the Virgin Islands caused by Hurricane Marilyn in September 1995.

Plaintiffs filed a Class Action Complaint ("Complaint") on July 9, 2001 in the United States District Court for the District of the Virgin Islands alleging, *inter alia*, that defendants Chase and CMMC (collectively "the Chase defendants"), which held mortgages on plaintiffs' property, agreed to procure or provide hazard insurance coverage for plaintiffs and then failed to procure or provide adequate insurance coverage or advise plaintiffs of the nature and extent of their coverage. Plaintiffs also assert that such defendants and CAS charged plaintiffs excessive premiums for insurance on their property after it was demolished or damaged by the hurricane. Based on these claims, plaintiffs asserted twelve causes of action in separate counts: negligent misrepresentation, fraud, negligence, breach of contract, breach of fiduciary obligation, breach of the duty of good faith and fair dealing, bad faith, and civil violations of the Racketeering Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* and the Criminally Influenced and Corrupt Organizations Act ("CICO"), 14 V.I.C. § 600 *et seq.* By Order dated September 26, 2001, then Chief Judge Edward Becker assigned the case to this Court pursuant to 28 U.S.C. § 292(b).

Defendants filed a Motion to Dismiss on February 1, 2002. By Order and Memorandum dated February 27, 2004, defendants' Motion to Dismiss was granted in part and denied in part. The Court granted the motion with respect to plaintiffs' claims for negligent misrepresentation, bad faith, violation of RICO § 1962(a), and violation of CICO § 605(c). The Court denied the Motion to Dismiss in all other respects.

In the Motion for Class Certification, plaintiffs propose that the Court certify the following class:

> All persons and entities who held a Chase mortgage on real property in the United States Virgin Islands and who had insurance on their mortgaged property through the Chase defendants' "forced place insurance" program at the time Hurricane Marilyn struck the Virgin Islands on September 15, 1995. Excluded from the Class are the defendants, any parent, subsidiary, or affiliate of the defendants, the officers, directors, agents, servants, or employees of the same, and the members of the immediate family of any such persons.

A hearing and oral argument on the Motion was held on April 14, 2004.

## II. BACKGROUND

### A. ALLEGATIONS OF THE COMPLAINT

The Court addressed the allegations of the Complaint in great detail in the February 27, 2004 Memorandum. Thus, the Court will only briefly summarize the Complaint in this Memorandum.

Plaintiffs obtained mortgages from Chase in connection with the purchase of their homes and other properties in the Virgin Islands. *Id.* ¶ 17.a. The mortgage agreements required plaintiffs to, *inter alia*, "acquire and maintain insurance on their mortgaged property." *Id.* ¶ 18. When plaintiffs were unable to procure adequate property insurance the Chase defendants offered plaintiffs a "forced placed insurance" program which is referred to in the Complaint as the U.S. Virgin Islands Property Insurance Program ("Property Insurance Program"). Plaintiffs contend that they purchased insurance coverage through the Property Insurance Program based on the Chase defendants' assurance that the program would provide them with "adequate coverage." *Id.* ¶ 18. According to the Complaint, the Chase defendants obtained "a bulk insurance policy for a percentage of their entire loss risk" through Lloyd's of London ("Lloyd's policy") that "acted essentially as reinsurance" to cover a percentage of the Chase defendants' risk in the Property Insurance Program. *Id.* ¶ 16(c).

On September 15, 1995, Hurricane Marilyn struck the Virgin Islands, causing substantial damage to each plaintiff's home and/or other property. *Id.* ¶ 21, 25. In the Complaint, plaintiffs assert three claims based on defendants' alleged insurance practices. First, plaintiffs claim that the Chase defendants did not provide plaintiffs with the "adequate" insurance they were promised. Specifically, plaintiffs claim the Chase defendants only insured their properties for an amount equal to their mortgage balances, not for the full value of their homes, and did not provide plaintiffs with the opportunity to purchase contents, or personal property, coverage. *Id.* ¶¶ 54–56. Second, plaintiffs allege that the Chase defendants did not inform plaintiffs that they were entitled to "additional" coverage provided under the insurance policy Chase procured from Lloyd's. *Id.* ¶¶ 24.a., 25. The "additional" coverage under this policy included coverage for (1) demolition and debris removal costs, (2) landscaping costs, (3) cost of temporary repairs, (4) cost of alternative housing while the insured property remained uninhabitable during the repair/reconstruction period, and (5) lost rental income. Third, plaintiffs contend that the Chase defendants continued to insure the mortgaged properties for "the full mortgage balance" after the properties were damaged or destroyed by the hurricane and, together with CAS, charged plaintiffs premiums based on that amount of coverage. According to plaintiffs, these premiums were excessive because hurricane damage reduced the value of plaintiffs' properties below their mortgage balances. *Id.* ¶¶ 26, 36–37, 59(b).

### B. EVIDENCE PRESENTED TO THE COURT

Defendants argued in their Motion to Dismiss that their only contracts with plaintiffs were the mortgage contracts, and under the mortgages, they had no obligation to provide insurance. In response, plaintiffs stated, *inter alia*, that their claims were based on separate agreements to procure or provide insurance, not the mortgages. The Complaint does not provide any details of the alleged agreements. The parties offered different explanations of how these separate agreements for insurance were reached in the class certification motion papers and at oral argument on that motion.

Defendants argue that the Property Insurance Program was a traditional "forced place" insurance program.[1] At oral argu-

---

1. "Forced placed insurance is hazard insurance purchased by a mortgagee(s) or servicer(s) of a mortgage(s) to protect the mortgagees' interest in the premises which are the subject of the mortgage. Standard mortgage instruments provide that a mortgagee can do that which is reasonable and/or necessary to maintain appropriate hazard insurance on the mortgagor's real property sufficient to protect the mortgagee's interest. Therefore, if mortgagors do not purchase hazard insurance, mortgagees are permitted to purchase the insurance and apply the premiums to the month-

ment, defendants' attorney argued that Chase had the contractual right under the mortgages to buy insurance on behalf of plaintiffs and charge them for the premiums. Tr. of April 14, 2004 Hearing/Oral Argument ("Tr.") at 94. In order to provide this insurance, Chase bought a $200 million "hazard and dwelling policy" policy from Lloyd's and paid the premium for this policy "up front." *Id.* at 97. The Lloyd's policy had a $40 million single occurrence limit. *Id.* The policy names Chase as the insured and Chase's borrowers, the mortgagors, as "additional named insureds." *Id.;* Defs.' Opp'n at 3. If a borrower could not provide proof of insurance, Chase sent a letter to the borrower informing him that it had obtained insurance on his behalf, the Lloyd's policy, and paid for this insurance. Tr. at 98. Chase then billed the borrower for this coverage. *Id.* A list of these borrowers was compiled and delivered to the individual responsible for administering the Property Insurance Program. *Id.* If a borrower obtained her own insurance, she would be removed from the program. *Id.*

Plaintiffs presented evidence that, contrary to defendants' arguments, the Property Insurance Program was not a traditional forced place insurance program because the Chase defendants procured insurance coverage under the Lloyd's Policy for amounts in excess of plaintiffs' mortgage balances and for personal property. In support of this position, plaintiffs produced a document referred to as a "Forced Order Report." Pls.' Reply at 20, Ex. 8. Plaintiffs claim this report lists, *inter alia,* the mortgage balance and the amount of insurance coverage for each participant in the Property Insurance Program. Tr. at 25–26. Based on the Forced Order Report, plaintiffs argue that the total amount of coverage exceeded the total outstanding mort-

gage indebtedness by fifty percent. Pls.' Reply at 2 n.2. While the Court will not rule on the accuracy of this percentage, the Court notes that, according to the Forced Order Report, a number of borrowers had coverage that exceeded their mortgage balance. For example, an individual named Maynard had $300,000 in coverage for a property located at 1–37 Bakkero in St. Thomas with a mortgage balance of $62,093.48.[2]

As further evidence that the Chase defendants obtained insurance coverage in excess of their mortgage interest, Cassan Pancham, the former General Manager for Chase in St. Thomas and a manager of the insurance program, stated that Chase sent a letter, dated July 29, 1994, to Property Insurance Program customers informing them that they could insure the full value of their homes and contents. Defs.' Opp'n at Ex. B (Pancham Aff.) ¶¶ 2, 4, Tab 1 (July 29, 1994 letter). In addition, a letter Chase sent to Thomas and Euphemia Webster, who owned a property insured by Chase, states that Chase will provide insurance in an amount equal to the coverage under their last policy with a different company. *Id.* at Ex. C (Webster Aff.) ¶¶ 2, 3; Ex. C, Tab A (October 28, 1992 letter from Chase Manhattan Bank to Webster). Moreover, according to documents submitted by defendants, Jean Maynard's original mortgage balance was $26,950 and the amount of her insurance coverage at the time of Hurricane Marilyn was $75,000. *Id.* Ex. K, Tab 12 (Maynard Mortgage), Tab 13 (Jean S. Maynard Insurance Form). Likewise, Mr. and Mrs. Pierre's original mortgage balance was $87,500 and the amount of their insurance coverage was $110, 250 at the time of the hurricane. *Id.* Ex. K, Tab 27 (Notice of Insurance for Hollister Pierre),

---

ly mortgage payment in order to protect their property interest." *Stevens v. Union Planters Corp.,* No. 00–1695, 2000 WL 33128256, at *1, 2000 U.S. Dist. LEXIS 22630, at *2–3 (E.D.Pa. Aug. 20, 2000).

**2.** Defendants stated at oral argument that the Forced Order Report was not "the subject of any deposition testimony" and plaintiffs' interpretation of the document is not supported by evidence in the record. Defendants denied that the list accurately reflected coverage amounts at the time of the hurricane because the report is a

"living document;" however, they admitted that it is a "decent example" of Chase's records for the program. Tr. at 96–98. At this stage of the litigation, the Court will not rule on the admissibility of this exhibit or rely on any of the specific amounts listed on the report. *See infra* § IV. However, because the report is capable of admission at trial as a business record, the Court will consider the report as evidence that in some cases the insurance coverage provided exceeded the mortgage balance.

Tab 28 (Hollister and Verdine Pierre Mortgage).

In ruling on the Motion to Dismiss, the Court struggled to determine how the Chase defendants and their borrowers agreed upon the amount of insurance coverage to be provided. Based on plaintiffs' statements in the Complaint that Chase "represented" and "assured" plaintiffs that it would provide plaintiffs with "adequate" insurance, the court found that the separate agreements were oral. Complaint ¶¶ 18, 20; *Charleswell v. Chase Manhattan Bank, N.A.*, 308 F.Supp.2d 545, 567 (D.Vi.2004) ("Plaintiffs' claims in this case are based on oral agreements."). Plaintiffs now argue that defendants operated a standardized insurance program that was not based on individualized, oral negotiations. According to plaintiffs, "Chase entered into uniform windstorm insurance contracts with all the putative class members [and] the existence, terms, and coverages are all memorialized in writing in defendants' or their agents' records." Pls.' Reply at 18. Despite this statement, plaintiffs produced no evidence of any written insurance agreements other than the Lloyd's policy.

Based on the evidence in the record, the Court finds that the amount of insurance coverage was determined in a variety of ways. Most of the named plaintiffs testified that they had a single conversation with a Chase representative in which the coverage amount was determined.[3] Ms. Maynard said she discussed insurance at a meeting with Chase and was told her house would be "fully covered." Defs.' Opp'n Ex. G (Maynard Dep.) at 24. Ms. Charleswell stated that she discussed insurance at a meeting with a Chase representative, and she was told "they would take care of everything." *Id.* Ex. D (Charleswell Dep.) at 50–51. Ms. Pierre testified that she responded to a letter from Chase that offered insurance and that she had a single conversation with Chase about insurance. Ms. Pierre also claims a Chase representative told her she would be provided with "full coverage" in an amount based on a figure that she provided and this amount would include coverage for damage

to the contents of her home, living expenses, landscaping losses, and debris removal. *Id.* Ex. H (Verdine Pierre Dep.) at 17–21. Ms. Jeffries testified that she had a telephone conversation with Chase and was told that Chase would "take care of it." *Id.* at Ex. J (Jeffries Dep.) at 43–44. All of the named plaintiffs either testified that they never received anything in writing from Chase after their initial conversation or that they did not remember the contents of any papers received from Chase. Ex. G (Maynard Dep.) at 118 (nothing in writing), Ex. D (Charleswell Dep.) at 64 ("can't recall what is what" with respect to letters received from Chase), Ex. F (Creque Dep.) at 44 (no letters), Ex. H (Verdine Pierre Dep.) at 25–26 (nothing in writing), Ex. I (Hollister Pierre Dep.) at 49 (nothing in writing), Ex. J (Jeffries Dep.) at 98 (never received policy or papers from Chase).

Plaintiffs' deposition testimony is buttressed by the evidence submitted by defendants to describe the Property Insurance Program. As discussed, Mr. Pancham states in his affidavit that "[i]f the borrower failed to respond to Chase's letter by providing proof of adequate insurance, Chase would obtain property insurance on the mortgaged property and charge the borrower's escrow account for the premiums." Ex. B (Pancham Aff.) ¶ 3. The July 29, 1994 letter which, according to Pancham, was sent to all borrowers who had purchased insurance, stated that borrowers "may wish to insure the full value of your home and contents." Ex. B. (Pancham Aff.) ¶ 4, Tab 1 (July 29, 1994 letter from Chase Manhattan Bank). According to the letter supplied by the Websters, Chase offered to provide insurance in an amount equal to the amount of the their last policy with their former insurer. Ex. C (Webster Aff.) ¶ 3, Tab A (October 28, 1992 letter from Chase to Thomas and Euphemia Webster).

Based on this evidence, the Court concludes that Chase borrowers could set the amount of their insurance coverage. However, if they failed to communicate with Chase about the amount of coverage, Chase would

---

3. Because she was a Chase employee when she signed her mortgage, Ms. Creque assumed she

was insured and never discussed insurance with Chase. *Id.* Ex. F (Creque Dep.) at 31–34.

determine the amount unilaterally, based on the borrower's mortgage balance or a prior policy amount, and charge its borrowers for this coverage.

The Complaint also fails to state how the terms of the separate agreements for insurance were determined. However, at oral argument, the parties agreed that plaintiffs were covered by the terms of the Lloyd's policy for the period from June 30, 1995 to June 29, 1996. Defs.' Opp'n Ex. A (Lawrence Aff.) ¶ 2; Ex. A., Tab A (Lloyd's Policy). According to plaintiffs, "The coverages to which our class was entitled, according to what Chase admits, were the coverages set forth in the Lloyd's policy." Tr. at 33. Defendants acknowledged at oral argument that plaintiffs were covered under the policy as "additional named insureds" and that this was the only policy covering plaintiffs. Tr. at 97, 107. On this issue, Mr. Pancham states in his affidavit that the "only insurance policy Chase purchased on behalf of its borrowers for the period June 30, 1995 through June 29, 1996 is the Lloyd's Policy. The Lloyd's Policy was the sole insurance policy obtained by Chase to cover the mortgaged property of those borrowers who did not obtain their own insurance." Defs.' Opp'n Ex. B (Pancham Aff.) ¶ 6. Although the parties agree that plaintiffs were covered by the Lloyd's policy, the parties disagree about whether the Chase defendants had any responsibility to plaintiffs with respect to the Lloyd's policy.

## III. DEFENDANTS' MOTION TO STRIKE CERTAIN ARGUMENTS IN PLAINTIFFS' REPLY MEMORANDUM

In their Motion to Strike Certain Arguments in Plaintiffs' Reply Memorandum in Support of Their Motion For Class Certification, defendants ask the Court to strike arguments raised by plaintiffs for the first time in their reply memorandum. The Court recognizes that it may, in its discretion, refuse to consider arguments raised for the first time in a reply. *United States v. Medeiros,* 710 F.Supp. 106, 110 (M.D.Pa.1989). However, because the defendants had an opportunity to respond to the new arguments and failed to establish any prejudice, the Court will consider all arguments advanced by the parties in their motion papers (including plaintiffs' reply) and at oral argument.

## IV. STANDARD FOR CLASS CERTIFICATION

A class action suit is appropriate when the "issues involved are common to the class as a whole." *Califano v. Yamasaki,* 442 U.S. 682, 701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). Under those circumstances, the certification of a class may both promote judicial economy and save resources for parties who may otherwise repeatedly litigate the same issue. *See id.*

For the Court to certify a plaintiff class, plaintiffs must first satisfy the four prerequisites for a class action set forth in Federal Rule of Civil Procedure 23(a):

(1) the class is so numerous that joinder of all members is impracticable,

(2) there are questions of law or fact common to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) the representative parties will fairly and adequately protect the interests of the class.

These four elements are often referred to as numerosity, commonality, typicality, and adequacy of representation, respectively. *See Hanrahan v. Britt,* 174 F.R.D. 356, 361 (E.D.Pa.1997). Commonality, like numerosity, evaluates the sufficiency of the class itself, while typicality and adequacy of representation evaluate the sufficiency of the named plaintiffs. *Hassine v. Jeffes,* 846 F.2d 169, 176 n. 4 (3d Cir.1988).

Plaintiffs are proceeding under Federal Rule of Civil Procedure 23(b). That rule provides that a class action may be maintained if the prerequisites of subdivision (a) are satisfied, and in addition:

the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of

the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). Rule 23(b)(3)'s elements are commonly referred to as predominance and superiority. *Josephat v. St. Croix Alumina, LLC*, No. 99–0036, 2000 WL 1679502, at *8, 2000 U.S. Dist. LEXIS 13102, at *8 (D.V.I. Aug. 7, 2000). Thus, to obtain class certification, plaintiffs in this case must prove numerosity, commonality, typicality, adequacy of representation, predominance and superiority of a class action over other available methods of resolving the dispute.

A district court has discretion to grant or deny class certification. *See Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir.1985); *In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 822 (3d Cir.1982). However, the "interests of justice require that in a doubtful case … any error, if there is to be one, should be committed in favor of allowing a class action." *Eisenberg*, 766 F.2d at 785.

In *Newton v. Dean Witter Reynolds, Inc.*, 259 F.3d 154 (3d Cir.2001) and *Johnston v. HBO Film Management, Inc.*, 265 F.3d 178 (3d Cir.2001), the Third Circuit addressed the level of deference a court should give the allegations of a complaint when deciding whether to certify a class. In *Newton*, the court found it necessary to "probe beyond the surface of plaintiffs' allegations in performing [its] review to assess whether plaintiffs' securities claims satisfy Fed.R.Civ.P. 23's requirements." *Newton*, 259 F.3d at 168–69. According to the *Newton* court, "[i]n reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action." *Id.* at 168. In both *Newton* and *Johnston*, the Third Circuit affirmed the district court's decision to reject evidence offered by the plaintiffs in determining that common questions did not predominate over individual questions. *Newton* involved the district court's rejection of evidence offered by plaintiffs in support of their argument that economic loss could be proved on a class wide basis, including, *inter alia*, an expert's testimony that he could devise a formula for measuring damages. *Newton*, 259 F.3d at 187–88. In *Johnston*, the district court decided that, despite plaintiffs' allegations and interpretation of the evidence, plaintiffs' claims were based primarily on oral, not written, misrepresentations. 265 F.3d at 185–86.

Although the Third Circuit has made it clear that a court should look beyond the pleadings when deciding a motion for certification, it has not specifically addressed what evidence can be considered by the Court. In a previous decision, this Court stated that "in addition to analyzing the allegations in the Complaint, in determining whether plaintiffs have met their burden of establishing each of the Rule 23 class action requirements, the Court will, to the extent necessary, consider affidavits, depositions and other discovery material appended as exhibits to the parties' submissions to the Court." *Hanrahan v. Britt*, 174 F.R.D. 356, 362 (E.D.Pa.1997).

On a motion for summary judgment, evidence submitted must be in a form "as would be admissible at trial and thus must be 'reducible to admissible evidence.'" *Williams v. West Chester*, 891 F.2d 458, 466 (3d Cir.1989) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). However, evidence that is not admissible in the submitted form but is "capable of being admissible at trial" if the party offering the evidence could satisfy the applicable admissibility requirements at trial can be considered on a motion for summary judgment. *Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 (3d Cir.1996). Following guidance from other district courts that have considered the issue, the Court will apply a similar standard in addressing the instant motion for class certification and will consider evidence even if it is not admissible in its submitted form. *Vinson v. Seven Seventeen HB Phila. Corp No. 2*, No. 00–6334, 2001 WL

1774073, at \*20 n. 28, 2001 U.S. Dist. LEXIS 25295, at \*69 n. 28 (E.D.Pa.2001) ("on a motion for class certification, the evidentiary rules are not strictly applied and courts will consider evidence that may not be admissible at trial"), *Blihovde v. St. Croix County*, 219 F.R.D. 607, 618 (W.D.Wis.2003) ("It is sufficient at this stage of the proceedings [motion for class certification] that the report is the kind of evidence that would be admissible if properly authenticated."); *Rockey v. Courtesy Motors, Inc.*, 199 F.R.D. 578, 582 (W.D.Mich.2001) ("courts have held that on a motion for class certification, the evidentiary rules are not strictly applied and courts can consider evidence that may not be admissible at trial."); *Dicker v. Allstate Life Ins. Co.*, No. 89–4982, 1990 WL 106550, at \*6, 1990 U.S. Dist. LEXIS 8586, at \*18 (N.D.Ill.1990) (stating that objections to the admissibility of evidence are premature at class certification stage).

## V. DISCUSSION

### A. PLAINTIFFS' CLAIMS

■ For the Court to determine whether the claims asserted by the putative class meet the requirements for class certification, it is necessary to first examine the underlying causes of action. If proof of the essential elements of a cause of action requires individual treatment, then class certification is unsuitable. *Newton*, 259 F.3d at 172. "[I]t is plaintiffs' burden to establish that common or generalized proof will predominate at trial with respect to these essential elements." *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 214 (E.D.Pa.2001).

As discussed in Section II(A) of this Memorandum, although plaintiffs asserted twelve counts in their Class Action Complaint, plaintiffs allegations can be reduced to three claims. First, plaintiffs claim the Chase defendants failed to obtain "adequate insurance." Specifically, plaintiffs claim the Chase defendants procured or provided insurance in an insufficient amount, leaving their equity interest uninsured, and failed to provide contents coverage for their personal property. Compl. ¶¶ 32(a), 54, 55. Second, plaintiffs allege that the Chase defendants failed to inform plaintiffs that they had "addi-

tional" coverage under the terms of "the Lloyd's policy Chase had procured." *Id.* ¶ 24(a). Third, plaintiffs allege that the Chase defendants and CAS charged the class excessive premiums by continuing to insure the mortgaged properties for the full mortgage balance after the hurricane and charging plaintiffs for that coverage despite the fact that the hurricane damage reduced the value of plaintiffs' properties below their mortgage balances. *Id.* ¶ 26.

At oral argument, plaintiffs' counsel acknowledged that the first claim was not appropriate for class treatment. Tr. at 14. Nevertheless, because plaintiffs still rely on the allegations of the Complaint, the Court will address all three claims.

### B. PREDOMINANCE AND COMMONALITY

In this case, the predominance factor is particularly significant because, for at least two of the three claims, common questions do not predominate. Since this prerequisite will dispose of these two claims, the Court will begin by addressing this factor and the related commonality prerequisite. Because "the Rule 23(b)(3) predominance requirement incorporates the commonality requirement of Rule 23(a)," these two requirements can be discussed together. *In re LifeUSA Holding*, 242 F.3d 136, 144 (3d Cir.2001). According to the Third Circuit, "even if Rule 23(a)'s commonality requirement is satisfied, predominance may not be, as it is more demanding." *Id.*

Commonality requires that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). "The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir.1994). The commonality standard requires only that the putative class share a common injury; differences in degree or nature of the injury do not preclude a finding of commonality. *Id.* at 60–61. The Third Circuit has set a "low threshold" for the satisfaction of both the commonality (and typicality) requirements. *Newton*, 259 F.3d at 183.

Rule 23(b)(3) requires that "questions of law or fact common to the class predominate over any questions affecting only individual members." "Predominance measures whether the class is sufficiently cohesive to warrant certification." *Newton*, 259 F.3d at 187. "Although the predominance requirement is far more demanding than the commonality prerequisite of Rule 23(a), a predominance of common questions does not require a unanimity of common questions." *Brooks v. Educators Mut. Life Ins. Co.*, 206 F.R.D. 96, 104 (E.D.Pa.2002) (citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)); *see also In re Linerboard Antitrust Litigation*, 305 F.3d 145, 163 (3d Cir.2002) ("most courts have refused to deny class certification simply because there will be some individual questions raised during the proceedings"). "Rather, it requires that common questions outweigh individual questions." *Id.* (citing *Johnston*, 265 F.3d at 185; *Newton*, 259 F.3d at 187). Common issues are more likely to predominate when the inquiry "focuses on defendants's conduct, that is, what defendants did rather than what plaintiffs did." *Linerboard*, 305 F.3d at 162.

### 1. *Plaintiffs' Claims of Failure to Provide or Procure Adequate Insurance*

Although there is some dispute as to how plaintiffs and the Chase defendants agreed upon the amount of insurance that was to be provided to participants in the Property Insurance Program, the named plaintiffs state that they orally communicated with the Chase defendants by telephone and never received any paperwork from Chase. *See supra* § II(B). "In cases raising issues similar to those here, it has become well-settled that, as a general rule, an action based substantially on oral rather than written communications is inappropriate for treatment as a class action." *Johnston*, 265 F.3d at 190; *see also In re LifeUSA Holding*, 242 F.3d 136, 146 (3d Cir.2001) (denying certification when misrepresentations were "made to over 280,000 purchasers by over 30,000 independent agents where the District Court found that the sales presentations (hence the alleged misrepresentations) were

neither uniform nor scripted."). The one exception to this general rule is for cases in which the oral communications followed a "uniform, scripted and standard" script. *Id.* at 191; *see also In re Prudential Ins. Co. of Am. Sales Practices Litig. Agent Actions*, 148 F.3d 283, 293 (3d Cir.1998) (finding common issues predominated based on defendants' "systematic fraudulent marketing scheme which made use of false and misleading sales presentations, policy illustrations, and marketing materials").

There is no evidence that the Chase defendants provided their sales representatives with a uniform, scripted, or standard script for the sale of insurance. To the contrary, the evidence demonstrates that the amount of insurance was determined by a variety of methods. For some members of the class, the Chase defendants based the amount of insurance on the amount of the borrower's last policy with another insurance company. Defs.' Opp'n at Ex. C (Webster Aff.) ¶¶ 2, 3; Ex. C, Tab A (October 28, 1992 letter from Chase Manhattan Bank to Webster). The Chase defendants set the amount of coverage for those class members who did not respond to letters requesting that information. Other class members requested a specific amount of insurance. Defs.' Opp'n Ex. K, Tab 38 (Letter from Jeffries to Chase requesting $100,000 in coverage). Most of the named plaintiffs testified that they orally agreed to purchase "full coverage." Defs.' Resp. Ex. G (Maynard Dep.) at 24 ("fully covered"); Ex. D (Charleswell Dep.) at 50–51 ("they would take care of everything"); Ex. H (Verdine Pierre Dep.) at 17–21 ("full coverage"). As a result, the resolution of this issue would require the Court to conduct an individualized inquiry for each class member to determine how the amount of their insurance was determined.

Further complicating this inquiry is evidence that at least some class members were offered contents coverage and a number of class members insured their properties for amounts well in excess of their remaining mortgage balance. The July 29, 1994 letter is evidence that Chase offered borrowers the opportunity to insure the full value of their properties and the contents under Chase's

Residential Property Program. *Id.* Ex. C, Tab B (July 29, 1994 letter from Chase to Mr. or Mrs. Webster). According to the Webster affidavit, at least some Chase borrowers received this letter. Defs.' Opp'n Ex. C (Thomas and Euphemia Webster Aff.) ¶¶ 2, 4. The Forced Order Report is evidence that a significant number of plaintiffs took advantage of this opportunity. On this issue, plaintiffs' attorney stated at oral argument that the report shows "the vast majority of the insured customers ... were insured for substantially more than their outstanding fiscal [or mortgage] balance." Tr. at 27. Based on this evidence, the Court concludes that some members of the class were given the opportunity to obtain insurance in an amount greater than their mortgage balance and to obtain contents coverage. Thus, with respect to this issue, the Court would have to conduct an individualized inquiry to determine who received notice regarding the availability of contents coverage and/or the opportunity to insure the full value of their homes and what action was taken as a result of the notice.

Resolution of claims that the Chase defendants failed to provide or procure adequate insurance for the class would require the Court to conduct an individualized inquiry into oral communications and other communications to and from the Chase defendants. Thus, under *Newton,* these claims are not appropriate for resolution on a class-wide basis because common questions do not predominate.

### 2. *Plaintiffs' Claims for the Additional Coverage*

■ At oral argument, plaintiffs' counsel amplified the theory that many class members did not submit claims for additional coverage because they were not aware that this coverage was available. Although plaintiffs' still claim that there are separate contracts for insurance between Chase and the class, they also claim the terms of these contracts are "set forth in writing in the Lloyd's policy." Tr. at 27, 31, 33. Because the Lloyd's policy is significant to plaintiffs' claim for additional coverage and plaintiffs' description of the policy has changed during the litigation, the Court will review the parties' arguments with respect to the policy.

In the Complaint, plaintiffs alleged that the Chase defendants purchased the Lloyd's policy to act "essentially as reinsurance" to cover "a percentage of their entire loss risk" under the Property Insurance Program. Compl. ¶ 16(c). In their Reply Memorandum with respect to class certification, plaintiffs argued that "Chase entered into uniform windstorm insurance contracts with all the putative class members [and] the existence, terms, and coverages are all memorialized in writing in defendants' or their agents' records." Pls.' Reply at 18. However, plaintiffs did not produce any evidence of written agreements other than the Lloyd's policy, and plaintiffs' attorney stated at oral argument that defendants have not produced any written policies other than the Lloyd's policy. Tr. at 39. On this issue, defendants' attorney acknowledged at oral argument that plaintiffs' insurance coverage is as set forth in the Lloyd's policy. In making this argument, defendants emphasized that plaintiffs are covered under the policy as "additional named insureds" and this contract is between Lloyd's and plaintiffs. Tr. at 97, 107, 110, *see also* Defs.' Resp. at Ex. B (Pancham Aff.) ¶ 6. According to defendants' attorney, "Chase and the borrowers have no contractual rights vis á vis each other on contract claims on that Lloyd's Policy;" because "Chase bank is the insured, it is not the insurer." Tr. at 110, 114.

Based on the record before the Court, the Court is not able to certify a class with claims based on separate, written, contractual agreements between plaintiffs and the Chase defendants. Plaintiffs have not provided any evidence of written agreements for insurance between the Chase defendants and the purported class members. To the contrary, based on the named plaintiffs' deposition testimony, these agreements were oral and, therefore, inappropriate for resolution in a class action under *Johnston. Johnston,* 265 F.3d at 190. Plaintiffs have also failed to explain the relationship between these separate agreements and the Lloyd's policy. If the Lloyd's policy was "essentially reinsurance," it is not clear how the terms of this

policy could control the separate contractual agreements with plaintiffs.

Alternatively, if plaintiffs determine, based on further discovery, that the Lloyd's policy is the only written insurance policy covering plaintiffs, it is possible that common questions would predominate. Although plaintiffs may not be able to successfully argue that defendants owe them any duties under the Lloyd's policy, the resolution of this question would be common to the class. Depending on the evidence, other common questions could include whether defendants adequately notified plaintiffs of the terms of their coverage and the single occurrence limit and whether defendants discouraged plaintiffs from filing claims for additional coverage during the adjustment process. If warranted by such additional evidence, the Court would consider certification of a class based on claims for additional coverage under the Lloyd's policy—a class of Chase mortgage holders insured under the Lloyd's policy at the time of the hurricane who sustained damages that would have been included under the so-called "additional coverage" in the Lloyd's policy and did not assert such claims. However, because plaintiffs have not briefed the legal issues associated with such a claim under the Lloyd's policy and still rely on the existence of a separate agreements, it is not appropriate for the Court to certify a class with claims based on the Lloyd's policy at this time.

### 3. *Plaintiffs' Claims for Excessive Premiums*

■ With respect to plaintiffs' claims for excessive premiums, defendants argue that there is "no authority" for plaintiffs' contention that they were required to reduce premiums after plaintiffs' loss or, in the alternative, that plaintiffs' claims are time barred because they received notice, in the form of monthly mortgage statements, that the premiums did not change in 1995 after the hurricane or thereafter. *Id.* at 3–4. The Court is skeptical about the merits of these claims. Plaintiffs rely on a New York state case decided in 1801, *Holmes v. The United Ins. Co.*, for the proposition that "when an insured pays premiums based on one value of the insured property, but the property is actually worth less or worth nothing, the insured may recover the excess premiums because it would be unfair to permit the insurer to keep premiums for a risk it never insured." Pls.' Supp. Memo. at 2 (citing *Holmes v. The United Ins. Co.*, 2 Johns. Cas. 329, 330, 1801 WL 606, *2, 1801 N.Y. LEXIS 60, *3 (N.Y.Sup.Ct.1801)). The Court agrees with defendants that *Holmes* is not directly on point because in *Holmes* the property insured was overvalued at the time the policy was issued, it was not damaged or destroyed during the policy period. Defs.' Supp. Mem. at 4. Although there is some support in the treatises for plaintiffs' claims, neither party has cited any Virgin Islands case law addressing the issue. Lee R. Russ, *Couch on Insurance 3D*, § 74:4 ("Where the risk insured against is realized, the policy terminates according to its terms and the insured is liable for no further premiums. Accordingly, the insured is not liable for premiums accruing after ... the destruction of the insured property.") (citing *Farmers' & Breeders' Mut. Reserve Fund Live Stock Ins. Co. v. Beck*, 66 Pa.Super. 528 (1917)); 5 Eric M. Holmes, *Holmes' Appleman on Insurance 2D*, § 33.16 ("An insured can recover for unearned premiums where the property is partially destroyed when the amount of the policy is reduced by the amount of loss.") (citing *Gipps Brewing Corp. v. Central Mfrs' Mut. Ins. Co.*, 147 F.2d 6, 17 (7th Cir.1945)).

However, the Court need not address the merits of the claims for excessive premiums at this time. Suffice it to say in the context of class certification that individual issues predominate as to these claims. Specifically, the excessive premium claims would require the Court to analyze the extent of damage to each property, what each property owner did or did not do with respect to rebuilding or repairing the property, and how much and for how long the premiums should have been reduced if the damage to the property was repaired.

There is also a statute of limitations issue applicable to these claims. Contrary to plaintiffs' assertion in their Supplemental Memorandum, these claims were not based on a breach of contract theory. Pls.' Supp.

Memo. at 4, Compl. ¶¶ 67–72. Specifically, they were not mentioned in Count VI, the only breach of contract count. The excessive premium claims were asserted in the counts of the Complaint based on tort: negligence (Count IV), fraud (Count V), breach of fiduciary obligation (Count VII), breach of duty of good faith and fair dealing (Count VIII), and CICO (Count XII). Such causes of actions are governed by the Virgin Islands' two year limitations period for tort claims or five year limitations period for CICO claims. 5 V.I.Code Ann. § 31(5)(A), 30 V.I.Code. Ann. § 600(h). Although the Court concluded that the discovery rule could, as a matter of law, operate to delay the start of the limitations period for claims based on the Lloyd's policy, the production of the Lloyd's policy was not essential to plaintiffs' discovery of claims for excessive premiums. Even if plaintiffs' argument that class members "cannot be expected to determine the amount of their insurance coverage from the size of their premium payments" is accepted, they were aware of the fact that the premiums did not change after their properties were damaged by the hurricane. Because plaintiffs did not file their Complaint until July 6, 2001, more than five years after their property was damaged by Hurricane Marilyn on September 15, 1995, these claims are time barred based on the evidence presently before the Court.

### 4. Conclusion—Predominance and Commonality

Plaintiffs' Motion for Class Certification is denied on the present state of the record because common questions do not predominate with respect to plaintiffs' claims for adequate insurance, additional coverage, and excessive premiums. This ruling is without prejudice to plaintiffs' right to file an amended class action complaint and/or a renewed motion for class certification based on claims for additional coverage under the Lloyd's policy if warranted by the evidence. As a result of this decision, it is not necessary for the Court to address the remaining Rule 23 requirements. However, because the Court denies the Motion without prejudice and grants plaintiffs leave to file an amended complaint and/or a renewed motion for class certification, the Court will briefly address the remaining Rule 23 requirements in the event plaintiffs decide to seek certification of a new class.

### C. REMAINING RULE 23 REQUIREMENTS

#### 1. Numerosity

Numerosity requires that "the class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). "No bright-line number rule applies in determining whether the numerosity requirement has been met." Potter v. Citicorp, No. 99–116, 2002 WL 31599974, at *4, 2002 U.S. Dist. LEXIS 11596, at *11 (D.V.I. April 4, 2002). However, "numbers in excess of forty, particularly those exceeding one hundred or one thousand, have sustained the requirement." Id. at *4, 2002 U.S. Dist. LEXIS 11596, at *12 (quoting Weiss v. York Hosp., 745 F.2d 786, 808 (3d Cir.1984)). Furthermore, "precise enumeration of the members of a class is not necessary … [but] a party seeking class certification may not rely on speculation or mere allegations of numerosity." Id. at *4, 2002 U.S. Dist. LEXIS 11596, at *12–13.

Plaintiffs allege that the class consists of "about one thousand members." Compl. ¶ 8. In their Reply, plaintiffs state that there are 989 class members. Pls.' Reply at 14. To substantiate this number, plaintiffs provided three documents. First, plaintiffs provided the above referenced "Forced Order Report" that they claim is a record from defendants' insurance administrator, Patrick Donnelly. This document lists the names of close to 1000 people alleged to have acquired insurance through the Property Insurance Program. Id. at Ex. 8 (Forced Order Report). Second, plaintiffs provided an October 20, 1995 memo from Donnelly stating that there were 989 insurance customers as of September 19, 1995. Id. at Ex. 7 (Oct. 20, 1995 from Patrick Donnelly to Gregory Gerard). Finally, plaintiffs presented a letter from Chase to the Virgin Islands Division of Banking and Insurance that states that its insurance program had 952 customers as of May 1994. Id. at Ex. 2 (July 12, 1994 letter from Lawrence Minster to Martin Emmanuel). Defendants admitted that this letter was a Chase busi-

ness record. *Id.* at Ex. 6 (Defs.' Supp. Resp. to Pls.' Request for Admis.) ¶ 191. Based on this evidence, plaintiffs have made a "threshold showing" that the class has close to 1000 members and that, as a result, the class is so numerous that joinder is impracticable.

The Court rejects defendants' argument that "plaintiffs' effort to prove numerosity is limited to ... conclusory and unsupported statement[s]." Defs.' Opp'n at 38. Unlike the plaintiffs in *Potter v. Citicorp*, No. 99–116, 2002 WL 31599974, at *5, 2002 U.S. Dist. LEXIS 11596, at *13 (D.V.I. April 4, 2002), the case relied upon by defendants, plaintiffs in this case have identified the documents on which they base their class number and described how these documents identify the number of class members. Plaintiffs' showing rises above the "conclusory allegations" found insufficient in *Potter* and is satisfactory for purposes of class certification.

### 2. *Typicality*

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "Typicality asks whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Baby Neal*, 43 F.3d at 55. In evaluating typicality, the Court should consider whether "the named plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir.1985). A finding of typicality will generally not be precluded even if there are "pronounced factual differences" where there is a strong similarity of legal theories. *See, e.g., In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 207 (E.D.Pa. 2001), *In re Resource America Sec. Litig.*, 202 F.R.D. 177, 182 (E.D.Pa. Aug.6, 2001).

Because the Court determined in Section V(B) of this Memorandum that the additional coverage claims are the only claims that may be appropriate for class certification, the Court will only address the typicality requirement with respect to such claims. The individual circumstances of some of the named plaintiffs would prevent them from vigorously pursuing claims for additional coverage. For example, according to exhibits in the record before the Court, the settlements received after the hurricane by some of the named plaintiffs exhausted their insurance coverage, and they would therefore not be able to assert claims for any "additional coverage." Specifically, Ms. Creque had $75,000 in insurance coverage at the time of the hurricane and she received a settlement check for $75,000. Def's Opp'n Ex. K, Tab 20 (Sep. 23, 1995 letter from Chase to Creque), Tab 21 (Cunningham International Form of Acceptance signed by Creque on November 6, 1995), Ex. F (Creque Dep.) at 46–49. Ms. Jeffries had $100,000 in insurance coverage and she received a $100,000 settlement check after the hurricane. *Id.* at Tab 38 (Letter from Jeffries to Chase requesting $100,000 in coverage), Tab 39 (Jeffries Notice of Insurance), Tab 41 (Letter from A. Jeffrey Weiss, Jeffries's attorney, stating that "a check was issued to her and you for the full policy amount"), Tab 46 (Check for $100,000 dated Dec. 12, 1995 from Lloyd's to Jeffries).

Moreover, some of the other named plaintiffs may be subject to a statute of limitations defense on the "additional coverage" claims. For example, Ms. Pierre admits she was told by a Chase representative that her insurance would cover damage to the contents of her home, living expenses, landscaping losses, and debris removal. *Id.* Ex. H (Verdine Pierre Dep.) at 17–21. Given this testimony, she can not argue she was unaware she was entitled to additional coverage before receiving a copy of the Lloyd's policy in 1999.

However, based on the Court's decision to deny certification because common questions do not predominate, it is not necessary for the Court to decide whether the fact that the claims of some representatives are not typical of the class is an additional ground for denying certification. It is also unnecessary for the Court to address the typicality of the remaining class representatives. Nevertheless, if plaintiffs decide the filing of an amended motion for class certification is war-

ranted by the facts, they must reconsider the selection of class representatives.

### 3. *Adequacy of Representation*

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." The adequacy of class representatives is dependant on satisfying two factors: 1) that the plaintiffs' attorney is competent to conduct a class action; and 2) that the class representatives do not have interests antagonistic to the interests of the class. *See In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 207 (E.D.Pa.2001) (quoting *In re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 800–01 (3d Cir.1995)). The adequacy requirement "functions as a catch-all requirement that 'tends to merge with the commonality and typicality criteria of Rule 23(a).'" *Newton*, 259 F.3d at 185 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)).

With respect to the first adequacy requirement, focusing on the competency of plaintiffs' attorneys, defendants do not dispute the qualifications of plaintiffs' counsel. Plaintiffs' attorneys provided the Court with their firm resumes and the Court finds them to be qualified. Pls.' Reply Ex. 9 (Firm Resume for Buehler, Reed & Williams), Ex. 10 (Firm Resume for A.J. Weiss & Associates).

With respect to the second requirement, relating to conflicts between the class and the representatives, the Court first notes that defendants have not challenged the adequacy of the named representatives. Moreover, inasmuch as the typicality and adequacy requirements tend to merge, the Court shares the same concerns about the adequacy criteria that it expressed in the section of this Memorandum dealing with the typicality requirement. *See supra* § V(C)(2). However, because the Court decides this case on predominance grounds, it is not necessary to address whether the interests of any of the named plaintiffs are antagonistic to the class.

### 4. *Superiority*

In light of the Court's conclusion that individual issues predominate over common issues, it is not necessary for the Court to discuss the superiority requirement at length. *See Johnston*, 265 F.3d at 194. Rule 23(b)(3) requires the Court to find that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3)(D) instructs the Court to consider "the difficulties likely to be encountered in the management of a class action" when making this determination. In *Johnston*, the Third Circuit affirmed a district court's decision to deny certification because, *inter alia*, individualized questions would present manageability problems. According to the court, "[t]rial of this case would involve essentially countless mini-trials to determine what alleged misrepresentation was made to each individual plaintiff, whether that person relied upon the statement, and the applicability of any defenses. Obviously, establishing proof of each of these elements and defenses would present severe manageability problems for the court." *Johnston*, 265 F.3d at 194.

Similarly, in this case, the individual inquiries discussed in the predominance section of this Memorandum present severe manageability problems for the Court. As a result, on the current state of the record, class treatment is not the most fair or efficient means for resolution of this controversy.

## VI. CONCLUSION

For the foregoing reasons, plaintiffs' Motion for Class Certification is denied without prejudice on the present state of the record. If warranted by the evidence, plaintiffs may file an amended complaint or a renewed motion for class certification on their claims for additional coverage. Defendants' Motion to Strike Certain Arguments in Plaintiffs' Reply Memorandum in Support of Their Motion for Class Certification is denied.

An appropriate order follows.